UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X
JUSTIN SHERWOOD,                                               **FIRST AMENDED**
**COMPLAINT**

Plaintiff,

-against-                                          **22-cv-07505 (BMC)**

THE CITY OF NEW YORK, NEW YORK CITY POLICE
DEPARTMENT ("NYPD") OFFICER JOHN MADERA, NYPD
OFFICER TIAGOM REIS, NYPD OFFICER ARTHUR
STURMAN, and NYPD DETECTIVE SAMANTHA STURMAN,

Defendants.
--------------------------------------------------------------------------------X

Plaintiff JUSTIN SHERWOOD, by his attorneys, Gideon Orion Oliver, and

Cohen&Green PLLC, hereby complains of the Defendants as follows:

## PRELIMINARY STATEMENT

1.      At all relevant times hereinafter mentioned, Plaintiff Justin Sherwood has

reported individuals who park illegally in bike lanes, sidewalks, and bus stops in his

neighborhood, downtown Brooklyn, to Defendant City of New York (the "City") through its 311

service.

2.      311 complaints about illegally parked vehicles are routed to a local New York

City Police Department ("NYPD") precinct for response.

3.      Upon information and belief, according to City policy – at least on paper - City

employees who acquire personal identifying information related to 311 complaints, such as the

name(s) and/or contact information of complainants, are required to keep that information

confidential, and only to use it for authorized official purposes.

4.      Mr. Sherwood has lodged many such 311 complaints related to the illegally

parked vehicles near two NYPD locations - the 84th Precinct and Transit Division ("TD") 30.

5.      Upon information and belief, many of the illegally parked NYPD vehicles Mr. Sherwood has reported are owned or operated by NYPD members or other City employees.

6.      In most cases, NYPD members have taken no enforcement action in response to Mr. Sherwood's complaints, and marked them as closed – often falsely.

7.      In several instances, which form the core of this complaint, City and/or NYPD employees have responded to some of Mr. Sherwood's 311 reports with harassment and/or retaliation.

8.      For example, after making 311 reports regarding vehicles he believed were illegally parked near the NYPD's 84th Precinct and TD30 on August 13th, August 26th, September 10th, and October 18th, 2021, Mr. Sherwood received harassing and retaliatory texts and/or phone calls, as described below, including from Defendants NYPD Officer John Madera, NYPD Officer Tiagon Reis, NYPD Officer Arthur Sturman, and NYPD Detective Samantha Sturman (collectively, the "Individual Defendants").

9.      In sending those texts and in making those phone calls, the Individual Defendants intended to intimidate Mr. Sherwood and prevent him from exercising his First Amendment rights to lodge complaints with the government about illegal activity – including illegal NYPD parking in the vicinity of the NYPD's 84th Precinct and TD30.

10.     The Individual Defendants' harassment of and retaliation against Mr. Sherwood has injured Mr. Sherwood, including, but not limited to, by causing him fear and emotional distress, and by interfering with, limiting, and casting a chill on Mr. Sherwood's ability and willingness to continue to engage in that reporting.

11.     Beyond that, at all relevant times, Defendant City agents, including NYPD supervisory officials who had the duty and responsibility to supervise and discipline subordinate

2

NYPD members, knew about the August 13th, August 26th, September 10th, and October 18th, 2021 incidents of harassment and retaliation, and failed to take reasonable action to supervise and/or discipline the Individual Defendants in response.

12.     For example, at all relevant times hereinafter mentioned, Deputy Inspector ("DI") Adeel S. Rana – who is, at this time, a non-party to this complaint – was, and is, the Commanding Officer of the NYPD's 84th Precinct.

13.     As such, DI Rana had, and has, the duty and responsibility to supervise and discipline subordinate NYPD members, including those Individual Defendants under his command at the 84th Precinct, in the performance of their duties, including related to parking around the 84th Precinct, responding to 311 complaints about illegally parked vehicles, including around the 84th Precinct and TD30, and the Individual Defendants' misconduct complained of below.

14.     As described more fully below, DI Rana knew that vehicles owned or operated by NYPD members were illegally parked near the NYPD's 84th Precinct and TD30, and that NYPD members under his command from the 84th Precinct had harassed and retaliated against Mr. Sherwood for reporting some of them.

15.     Additionally, Defendant City knew about the Individual Defendants' misconduct complained of below, including, but not limited to, because the City's Department of Investigation and Civilian Complaint Review Board, and the NYPD's Internal Affairs Bureau, and DI Rana, all directly received complaints about the August 13th, August 26th, September 10th, and October 18th, 2021 incidents of harassment and retaliation, and because City officials, including, but not limited to, New York City Council Members, and then-New York City Mayor Bill de Blasio, learned about the incidents through reports in the press and otherwise, and called

3

for and/or vowed to conduct investigations into them.

16.     However, upon information and belief, neither DI Rana, nor any other NYPD member, has taken disciplinary action against the Individual Defendants – and certainly not the sort of meaningful disciplinary action that would send a message to the Individual Defendants and other NYPD members that harassing and retaliating against people who complain about illegally parked vehicles, including such vehicles owned and operated by NYPD members, will not be tolerated by the NYPD.

17.     Defendant City's failure to supervise and discipline the Individual Defendants meaningfully regarding their harassment of and retaliation against Mr. Sherwood has sent the messages to NYPD members that they can not only flout parking laws, creating dangerous conditions for pedestrians, cyclists, and other users of the City's roadways and sidewalks, but also harass and retaliate against those who seek to call them to account, with impunity.

18.     That is particularly so when considered against the backdrop of the City's failures to supervise and discipline other NYPD members who have also similarly harassed or retaliated against other people aside from Mr. Sherwood who have reported illegally parked NYPD and other vehicles, and its failures to take action against illegal NYPD parking in the vicinity of the NYPD's 84th Precinct and TD30.

19.     Mr. Sherwood has therefore brought this lawsuit in order to seek redress for the violations of his own rights and to bring attention to, and hopefully change, the City's policies and practices of condoning and/or encouraging NYPD harassment and/or retaliation against people who file 311 complaints regarding illegally parked NYPD and other vehicles.

## PARTIES

20.     At all relevant times mentioned herein, Plaintiff Justin Sherwood (Mr.; he/him) was a resident of Kings County in the City and State of New York.

21.     At all relevant times mentioned herein, Defendant City of New York (the "City") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

22.     At all relevant times hereinafter mentioned, upon information and belief, Defendant NYPD Officer John Madera was assigned to the NYPD's 84th Precinct.

23.     At all relevant times hereinafter mentioned, upon information and belief, Defendant NYPD Officer Tiagom Reis was assigned to the NYPD's 84th Precinct.

24.     At all relevant times hereinafter mentioned, upon information and belief, Defendant NYPD Detective Samantha Sturman was assigned to the NYPD's 84th Precinct.

25.     At all relevant times hereinafter mentioned, upon information and belief, Defendant NYPD Officer Arthur Sturman was assigned to the NYPD's Field Training Unit.

26.     Plaintiff refers to Defendant NYPD Detective Samantha Sturman and Defendant NYPD Officer Arthur Sturman collectively as the "Sturman Defendants."

27.     At all relevant times hereinafter mentioned, Defendant City employed Defendants Reis, Sturman, Sturman, and Madera (collectively, the "Individual Defendants") within the NYPD.

28.     At all times hereinafter mentioned, the Individual Defendants, either personally or through their employees or subordinates, were acting under color of state law and/or in

compliance with the official rules, regulations, laws, statutes, customs, usages, policies, and/or practices of the State or City of New York.

29.     Each and all of the acts and omissions of the Individual Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

30.     At all relevant times, the Individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

31.     The Individual Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

32.     At all times relevant herein, as set forth more fully below, the Individual Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

33.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Individual Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

34.     The Individual Defendants are sued herein in their individual capacities.

## JURISDICTION

35.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and 1988, the First and Fourteenth Amendments to the United States Constitution, and New York law.

36.     This Court has jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

37.     The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes this Court to grant Plaintiff the declaratory relief he seeks.

## VENUE

38.     Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Eastern District of New York, where the Defendant City of New York resides, a number of the Individual Defendants reside, and where the majority of the actions complained of herein occurred.

## ON PLAINTIFF'S STATE LAW CLAIMS REGARDING THE SEPTEMBER 10, 2021 INCIDENT

39.     Plaintiff served a Notice of Claim on the Office of the Comptroller of the City of New York related to the September 10, 2021 incident described below on December 9, 2022.

40.     By letter dated December 9, 2022, the Comptroller acknowledged Plaintiff's notice of claim regarding the September 10, 2021 incident.

41.     On December 9, 2022, Plaintiff initiated a special proceeding in New York State Supreme Court seeking leave to file a notice of claim out of time, which has been assigned New York County Index No. 160550/2022.

42.     On January 26, 2023, the Court heard oral argument on the application and reserved decision pending oral argument in the related proceeding arising from Plaintiff's notice of claim regarding the October 18, 2021 incident.

43.     This action has been initiated within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York law arising from the September 10, 2021 incident.

## ON PLAINTIFF'S STATE LAW CLAIMS REGARDING THE OCTOBER 18, 2021 INCIDENT

44.     Plaintiff served a Notice of Claim on the Office of the Comptroller of the City of New York related to the October 18, 2021 incident on January 16, 2023.

45.     Also on January 16, 2023, Plaintiff initiated a proceeding in New York State Supreme Court seeking leave to file a notice of claim related to the October 18, 2021 incident out of time, which has been assigned New York County Index No. 150464/2023.

46.     The Court has set a briefing and argument schedule by which oral argument in the matter is scheduled for February 23, 2023.

**47.**     This action has been initiated within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York law related to the October 18, 2021 incident.

## ADDITIONAL FACTS

### *The August 13, 2021 incident (involving Defendant Reis)*

48.     On August 13, 2021, soon after Mr. Sherwood made 311 complaints regarding illegally parked vehicles in the vicinity of the 84th Precinct and/or TD30, a caller identified himself as a NYPD member, but refused to give his name and hung up.

49.     Mr. Sherwood made a complaint about that August 13, 2021 incident to the City's Civilian Complaint Review Board ("CCRB").

50.     In an October 20, 2022 letter, the CCRB informed Mr. Sherwood that it had substantiated Abuse of Authority and Discourtesy allegations related to Defendant NYPD Officer Tiagom Reis and the August 13, 2021 incident, and recommended "Command Discipline B."

51.     The authorized penalties for a Command Discipline B range from a reprimand to forfeiture of up to 10 vacation days only.

**_The August 26, 2021 incident (involving Defendant Det. Sturman)_**

52.     On August 26, 2021, soon after Mr. Sherwood made 311 complaints regarding illegally parked vehicles in the vicinity of the 84th Precinct and/or TD30, a person who identified herself as "Detective Sturman" called Mr. Sherwood and offered to set up a meeting between him and a NYPD Neighborhood Coordination Officer ("NCO").

53.     After Mr. Sherwood declined, the two argued, and Det. Sturman ended the call by yelling, "Stop calling, dickhead!"

54.     Mr. Sherwood made a complaint about that August 26, 2021 incident to the CCRB.

55.     In a November 9, 2022 letter, the CCRB informed Mr. Sherwood that it had substantiated allegations of Offensive Language and Discourtesy as to Detective Samantha Sturman related to the August 26, 2021 incident and complaint, and recommended "Command Discipline A."

56.     The authorized penalties for a Command Discipline A range from a reprimand up to forfeiture of up to five vacation days.

**_The September 10, 2021 incident (involving Defendant Madera)_**

57.     On September 10, 2021, Mr. Sherwood observed many vehicles parked on the

Schermerhorn Street bike lane and/or sidewalk.

58.     Mr. Sherwood took photographs of those conditions and submitted each vehicle

as a separate complaint to 311.

59.     Mr. Sherwood's first complaint was received by 311 at 2:27pm.

60.     By 2:42pm, Mr. Sherwood had submitted 8 such complaints.

61.     All of the 311 complaints were eventually closed with the following status: "The

Police Department responded to the complaint and determined that police action was not

necessary."

62.     At 2:42pm, Mr. Sherwood received a phone call from a blocked number.

63.     During this phone call a man falsely identified himself as Josh Hader, a New York

City 311 operator.

64.     Upon information and belief, the caller was in fact Defendant NYPD Officer John

Madera.

65.     On the call, Defendant Madera said in substance that since Mr. Sherwood was

submitting multiple complaints, he might be barred from submitting complaints to 311 altogether

going forward.

66.      Defendant Madera also mentioned the location Mr. Sherwood was complaining

about was in front of a NYPD Transit Precinct – TD30.

67.     On the morning of October 18, 2021, Julianne Cuba reported in *StreetsblogNYC*

about the August 13th, August 26th, and September 10th, 2021 incidents. *See* Julianne Cuba,

"BAD COP, BAD COP: NYPD Threatens Tipster for Filing 311 Complaints About Illegal

Parking", *StreetsblogNYC*, October 18, 2021 (the "10/18/21 Article"). Available online at

https://nyc.streetsblog.org/2021/10/18/bad-cop-bad-cop-nypd-threatens-tipster-for-filing-311-

10

complaints-about-illegal-parking/ (last accessed February 7, 2023).

68.     According to the 10/18/21 Article, a "spokesperson for 311 said that 311 operators do not personally reach out to those who file complaints, and that complaints are shared directly with the local precinct."

69.     Also according to the 10/18/21 Article, NYPD spokesperson Detective Sophia Mason said: "We are aware of the allegation regarding the detective and the matter is under internal review" and: "Parking in the vicinity of the 84th Precinct is extremely limited. The Commanding Officer is aware of complaints regarding bike lanes surrounding the precinct and is working to address the condition."

70.     Upon information and belief, the "Commanding Officer" referred to is DI Rana.

71.     Also according to the 10/18/21 Article, a CCRB spokesperson said "that the case has been assigned to an investigator, who is looking at whether the alleged harassment constitutes 'misconduct' that could require a disciplinary recommendation."

72.     On or about October 21, 2021, Mr. Sherwood contacted the NYPD's Internal Affairs Bureau ("IAB") to complain about the September 10, 2021 incident.

73.     Mr. Sherwood learned the IAB had assigned the September 10, 2021 incident Case # 21-23530.

74.     On October 21, 2021, Mr. Sherwood e-mailed the IAB a recording of the September 10, 2021 phone call.

75.     Mr. Sherwood also reported the September 10, 2021 incident to the City's CCRB himself on March 8, 2022, and cooperated fully with the CCRB's investigation.

76.     In a letter dated November 10, 2022, the CCRB informed Mr. Sherwood that it had substantiated allegations of discourtesy, abuse of authority, and making a false statement to

11

the CCRB against Defendant Madera related to the September 10, 2021 incident.

77.     As a result, the CCRB has recommended Charges and Specifications be brought against Defendant Madera related to the September 10, 2021 incident.

78.     Charges and Specifications involve a NYPD administrative prosecution that can result in termination.

79.     Mr. Sherwood heard nothing from the IAB between October of 2021 and July of 2022 about the September 10, 2021 matter.

80.     At some time between 9:30 and 10:00pm on July 26, 2022, a man claiming to be a NYPD member who said his last name was Townsend and that he was from the IAB visited Mr. Sherwood's apartment building and said he wanted to speak with Mr. Sherwood about a complaint he had made about a "prank phone call."

81.     That person also said his partner had called Mr. Sherwood.

82.     Mr. Sherwood saw a missed call from a 917 number.

83.     Mr. Sherwood informed them they would need to make an appointment to speak with him.

84.     On July 29, 2022, Mr. Sherwood's counsel called the 917 number in question.

85.     No voicemail was set up, and nobody from the NYPD returned the call.

86.     Assuming those people were NYPD IAB members, Mr. Sherwood has not heard from the IAB since.

### *The October 18, 2021 incident (involving the Sturman Defendants)*

87.     The next incident in which NYPD members harassed Mr. Sherwood occurred just hours after *StreetsblogNYC* published the 10/18/21 Article mentioning Defendant Detective Sturman.

88.     On October 18, 2021, Mr. Sherwood saw many cars parked on the 300 Block of Jay Street bike lane and/or sidewalk, in violation of City signage.

89.     A number of them displayed various City and/or other governmental parking placards.

90.     Mr. Sherwood took photographs of those illegally parked vehicles and submitted separate complaints to the City via its 311 service as to each vehicle.

91.     The City received the first such 311 complaint from Mr. Sherwood at 1:33pm.

92.     By 1:50pm, Mr. Sherwood had submitted 11 such complaints.

93.     All of the 311 complaints were eventually closed with the following status: "The Police Department responded to the complaint and with the information available observed no evidence of the violation at that time."

94.     At 1:52pm, Mr. Sherwood received a text from 631-685-5448 - a number unknown to him - that said: "Keep fucking around."

95.     Mr. Sherwood later determined the text had been sent through a service called TextNow, and that TextNow likely had the identity of, and other information about, the sender.

96.     Throughout the afternoon of October 18, 2021, Mr. Sherwood received around eight calls from a blocked number. Each time he declined the call, a new call would start.

97.     After receiving the 1:52pm text message, Mr. Sherwood answered a blocked call. The caller identified himself as "Lieutenant Charles" and – as Defendant Det. Sturman had on August 26, 2021 - asked Mr. Sherwood to meet with an NCO to discuss his concerns.

98.     When Mr. Sherwood declined and asked if "Lt. Charles" had sent the text message, they said no, and recommended Mr. Sherwood call 911 to report the incident.

99.     The same day, October 18, 2021, Mr. Sherwood reported the harassing text

13

message sent through TextNow and the harassing calls from the blocked number to the CCRB.

100.     The CCRB assigned complaint #202106302 to Mr. Sherwood's October 18, 2021 complaint.

101.     Also on October 18, 2021, Mr. Sherwood communicated with New York City Council Member Stephen Levin about the harassment.

102.     Upon information and belief, between October 18, 2021 and October 22, 2021, Council Member Levin contacted DI Rana about the October 18, 2021 and previous NYPD harassment of Mr. Sherwood.

103.     On October 19, 2021, *StreetsblogNYC* published an article by Julianne Cuba about the October 18, 2021 harassing text message and calls. *See* Julianne Cuba, "AWFULLY IRONIC: NYPD Threatens Tipster After Streetsblog Story About Prior Harassment Over 311 Complaints About Illegal Parking", *StreetsblogNYC*, October 19, 2021. Available online at https://nyc.streetsblog.org/2021/10/19/irony-alert-nypd-threatens-tipster-after-streetsblog-story-about-prior-harassment-over-311-complaints-about-illegal-parking/ (last accessed February 7, 2023).

104.     Also on October 19, 2021, Mr. Sherwood communicated with then-Council Member-Elect Lincoln Restler about the October 18, 2021 text message. Mr. Restler urged Mr. Sherwood to call 1-800-PRIDE-PD, and Mr. Sherwood did so that day.

105.     Also in October of 2021, Mr. Sherwood filed a complaint regarding the October 18, 2021 incident with the City's Department of Investigation ("DOI").

106.     In an October 20, 2021 letter, the CCRB informed Mr. Sherwood it had determined it did not have jurisdiction over part of Mr. Sherwood's complaint – to the extent that part of the complaint involved allegations of corruption and/or acts of a criminal nature - and that

14

the CCRB was referring parts of Mr. Sherwood's October 18, 2021 complaint having to do with those allegations to the NYPD's IAB.

107.    The CCRB assigned a new case number, #202106307, to investigate the parts of Mr. Sherwood's October 18, 2021 complaint that it had not referred to the IAB.

108.    Mr. Sherwood has cooperated fully with the CCRB in connection with its investigation into Complaint #202106307, including by sending screenshots and other evidence to the CCRB, and by giving an interview to the CCRB on October 20, 2021.

109.    Also on October 20, 2021, Mr. Sherwood spoke with a NYPD Officer Abreu regarding his October 19, 2021 call to 1-800-PRIDE-PD.

110.    Officer Abreu took information about Mr. Sherwood's complaint, but otherwise appeared to respond with skepticism and disbelief.

111.    On October 22, 2021, New York City Council Member Stephen Levin informed Mr. Sherwood that he had spoken about the alleged police harassment of Mr. Sherwood with DI Rana and that DI Rana stated in sum that "he takes it very seriously but that he didn't think that it was any of the officers under his command" but that if it is one of his officers Mr. Sherwood should "rest assured strict discipline actions will be taken."

112.    That is, DI Rana acknowledged that the allegations — if true — merited strict disciplinary action.

113.    On November 3, 2021, a representative of the DOI informed Mr. Sherwood the DOI had learned about the October 18, 2021 incident and Mr. Sherwood's complaint through the October 19, 2021 *StreetsblogNYC* article.

114.    The DOI representative told Mr. Sherwood that the complaint regarding the October 18, 2021 incident he had filed with the DOI had been forwarded to the IAB.

15

115.    On November 18, 2021, a DOI representative informed Mr. Sherwood that the IAB had assigned Log No. 2021-23416 and that the complaint was "being handled by the 84th Precinct with a current status of open."

116.    Mr. Sherwood subsequently spoke with the DOI related to their investigation, and provided all of the information the DOI requested.

117.    On December 7, 2021, Mr. Sherwood e-mailed the DOI and IAB asking why the DOI had not issued a subpoena to TextNow to identify the sender of the October 18, 2021 text message.

118.    Mr. Sherwood has never heard from the IAB about his complaint, Log No. 2021-23416, or any aspect of the October 18, 2021 matter.

119.    Mr. Sherwood is not aware of the status of the DOI's investigation.

120.    Although Mr. Sherwood made a number of inquiries in 2021 and 2022 to the DOI about the status of its investigation, the DOI has not provided Mr. Sherwood with any information about its investigation or its outcome.

121.    In a letter dated December 19, 2022, the CCRB informed Mr. Sherwood that it had substantiated two allegations each of Abuse of Authority and two allegations each of Discourtesy against related to Mr. Sherwood's October 18, 2021 complaint (Complaint #202106307) against the Sturman Defendants.

122.    The CCRB determined that each of the Sturman Defendants had spoken discourteously to Mr. Sherwood and threatened Mr. Sherwood with the use of force, and recommended that each Sturman Defendant face "Command Discipline B" as a result.

16

**_Additional facts and incidents related to Mr. Sherwood's municipal liability claim_**

123.    Mr. Sherwood's experiences should be viewed in the context of not only the

persistent, illegal NYPD parking around its 84th Precinct and TD30, the harassment and

retaliation he himself experienced, and the City's failures to investigate or take action in

response thereto, but also taking into account the City's – and particularly the NYPD's – broader

failures to respond to 311 complaints about illegal parking, including illegal NYPD parking, and

failures to investigate, supervise, and/or discipline in NYPD members who harass and/or retaliate

against people who complaint about such illegal parking.

124.    As the City has greater access to information about 311 complaints about illegally

parked vehicles, NYPD responses, and the nature, extent, and results of City investigations into

such 311 complaints, as well as incidents of NYPD harassment and/or retaliation against people

who make such complaints, and the nature, extent, and results of City investigations into those

incidents,  the following facts, events, and incidents should serve as representative examples,

rather than something like an exhaustive list.

125.    On October 21, 2021, _StreetsblogNYC_ published an investigation by Jesse Coburn

into NYPD responses to 311 complaints, which "analyzed more than 26 million 311

complaints…dating back to 2010, and interview dozens of city officials, former city police

officers, safe-streets advocates, attorneys and residents who have filed years worth of 311

complaints" and concluded, among other things, that the NYPD "closes thousands of service

requests about driver misconduct each year in under five minutes" – a length of time that makes

it "implausible that officers were actually investigating and resolving" the complaints "given it

takes the NYPD more than seven minutes on average to respond to even the most critical

emergencies, per city data." _See_ Jesse Coburn. "IGNORED, DISMISSED: How the NYPD

17

Neglects 311 Complaints about Driver Misconduct," *StreetsblogNYC*, October 21, 2021 (the

"10/21/21 Article"). Available online at https://nyc.streetsblog.org/2021/10/21/ignored-

dismissed-how-the-nypd-neglects-311-complaints-about-driver-misconduct/ (last accessed

February 7, 2023).

126.    According to the 10/21/21 Article, people "who together have filed more than an

estimated 1,000 driver misconduct service requests say those efforts have almost never led to the

problems being addressed" and "some reported receiving harassing messages after filing

complaints."

127.    Also according to the 10/21/21 Article, "multiple people interviewed by

Streetsblog said they've received harassing phone calls after filing 311 complaints about driver

misconduct," including, but not limited to, Chong Bretillon and Paul Vogel. As reported in the

10/21/21 Article:

> a.   "That includes Chong Bretillon, of Queens. On around six occasions, she said,
> she's received a barrage of calls from concealed phone numbers in the middle
> of the night after filing 311 complaints about illegal parking hours earlier.
> Occasionally, the callers would leave messages, one of which contained only
> the sound of heavy breathing. She said she believes it was officers seeking to
> intimidate her into no longer filing complaints. 'Nobody calls someone at 3
> a.m. There's just no reason to do it,' she said. 'Unless you're trying to harass
> somebody'"; and

> b.   "Paul Vogel, of Brooklyn, has also received strange voicemails from blocked
> phone numbers after filing 311 complaints. In one, a man says Vogel's name
> repeatedly without identifying himself. In another, the caller breathes heavily
> into the phone and hangs up. 'It just strikes me as clearly something that's
> done to intimidate,' he said. 'It's bizarre.'"

128.    On October 26, 2021, Jesse Coburn reported in *StreetsblogNYC* that New York

City Council Member Bob Holden had "received phone calls from police officers at 3 a.m. after

filing a 311 complaint hours earlier" in a manner he said was "'inappropriate'" and that NYPD

18

members had also "closed his 311 complaints in just a few minutes, he said, and reported in the 311 system that they had addressed issues raised when in fact they hadn't." *See* Jesse Coburn, "Council Member Calls For Probe of Alleged 311 Harassment As Colleague Calls Dead-of-Night Calls from Cops 'Inappropriate'",*StreetsblogNYC,* October 26, 2021 (the "10/26/21 Article"). Available online at https://nyc.streetsblog.org/2021/10/26/council-member-calls-for-probe-of-alleged-311-harassment-as-colleague-reveals-dead-of-night-calls-from-cops/ (last accessed February 7, 2023).

129.    Also according to the 10/26/21 Article, Council Member Ben Kallos from Manhattan "called for an investigation into [the] harassing messages that residents said they've received after filing 311 reports about driver misconduct to the NYPD" and "asked anyone who has received such calls to contact his office by" e-mail.

130.    The topics in the 10/21/21 Article and the 10/26/21 *StreetsblogNYC* Article were at issue in an October 26, 2021 joint hearing of the Council's transportation and oversight committees at which, according to Jesse Coburn's October 27, 2021 *StreetsblogNYC* report, "City Council members voiced frustration with the NYPD's handling of 311 complaints about illegal parking" and "police officials defended the department's efforts" including by stating "that some officers had been disciplined for mishandling 311 complaints, though officials did not say how many." *See* Jesse Coburn, "Amid Multiple Investigations, NYPD Defends Its 311 Response at Council Hearing," *StreetsblogNYC*, October 27, 2021 (the "10/27/21 Article"). Available online at https://nyc.streetsblog.org/2021/10/27/amid-multiple-investigations-nypd-defends-its-311-response-at-council-hearing/ (last accessed February 7, 2023).

131.    Also according to the 10/27/21 Article, "[t]he NYPD did not respond to questions Tuesday about how many officers have been disciplined for mishandling 311 complaints, what

discipline they faced, or whether the department will review issues with the NYPD's response to 311 complaints that were documented by Streetsblog."

132.   Also on October 26, 2021, the Council issued a subpoena to the NYPD seeking "records on the department's response [to] illegal parking complaints submitted via 311, including some that Council investigators found the police had ignored, despite reporting otherwise." *See* Jesse Coburn, "Mayor Vows to Investigate Alleged Harassment of 311 Users After Recent Streetsblog Investigation," *StreetsblogNYC*, October 28, 2021 (the "10/28/21 Article"). Available online at https://nyc.streetsblog.org/2021/10/28/mayor-vows-to-investigate-alleged-harassment-of-311-users-after-recent-streetsblog-investigation/ (last accessed February 7, 2023).

133.   According to Alex Pareene in *The Atlantic,* the Council's

investigators filed 311 reports on 50 observed examples of illegal parking throughout the city. 'In each case,' the council wrote in a letter to NYPD Commissioner Dermot Shea, 'NYPD claimed to properly respond and marked the SR as closed. But for 72% (36) of these SRs, our team observed that NYPD did not properly respond.' Mainly, officers would drive or walk past the reported vehicle without doing anything. The NYPD did not respond in any way to 14 of the requests, despite officially claiming to have done so.

*See* Alex Pareene, "THE LAWLESSNESS THAT COPS IGNORE", *The Atlantic*, December 16, 2021. Available online at https://www.theatlantic.com/ideas/archive/2021/12/cops-311-broken-windows-unaccountable/621022/ (last accessed January 30, 2023).

134.   According to the 10/28/21 Article, "[t]he Council had asked for the records [regarding those 311 reports] previously, but the NYPD did not provide them," citing Jesse Coburn, "NYPD Ignores Council Request for Info on Allegedly Fraudulent 311 Responses," *StreetsblogNYC*, October 25, 2021. Available online at

https://nyc.streetsblog.org/2021/10/25/nypd-ignores-council-request-for-info-on-apparently-fraudulent-311-responses/ (last accessed February 7, 2023).

135.    Also according to the 10/28/21 Article, on October 27, 2021, then-New York City Mayor Bill de Blasio said at a news conference that the City would "'immediately investigate' allegations from residents who say they received harassing phone calls and messages after filing 311 complaints to the NYPD.'"

136.    Also according to the 10/28/21 Article, "'[w]hether [such calls are] coming from a city employee or someplace else, it's not good,' the mayor said when asked about the alleged harassment. 'What we need to know is what happened in those cases.'"

137.    Also according to the 10/28/21 Article, "[a]n NYPD spokesperson said the harassment allegations reported by Streetsblog are 'under internal review,' but did not respond to questions about that review."

138.    On December 21, 2021, Jesse Coburn reported in *StreetsblogNYC* that the City had "launched an investigation into harassment that 311 users said they faced after submitting illegal parking reports to the NYPD, ratcheting up the scrutiny of the police response to driver misconduct complaints." *See* Jesse Coburn, "City Investigating NYPD 311 Harassment Allegations After Streetsblog Report", *StreetsblogNYC,* December 21, 2021 (the "12/21/21 Article"). Available online at https://nyc.streetsblog.org/2021/12/21/city-investigating-nypd-311-harassment-allegations-after-streetsblog-report/ (last accessed January 31, 2023).

139.    According to the 12/21/21 Article:

Users of 311 told Streetsblog they've received barrages of phone calls in the middle of the night from blocked phone numbers after submitting reports about cars obstructing bike lanes, using dubious parking placards or flouting other traffic laws. Some anonymous callers left voicemails that contained only heavy

breathing or a man repeating a 311 user's name over and over. The recipients said they believe it was cops trying to intimidate them into no longer filing complaints.

140.    Also according to the 12/21/21 Article, a "spokeswoman for the city's Department of Investigation confirmed . . . that agency staffers were probing the allegations" but "did not provide further details about the city inquiry."

141.    According to February 9, 2022 reporting by Jesse Coburn in *StreetsblogNYC*, on January 31, 2022, after Tony Melone filed a 311 complaint to the NYPD about an illegally parked truck and including his own name and number, and he shoveled snow on its hood, an "unidentified man" threatened "him over the phone" by saying "'I'm gonna kill you, Melone.'" *See* Jesse Coburn, "Death Threats Follow Brooklyn Man's Illegal Parking Complaints to 311 and the NYPD", *StreetsblogNYC,* February 9, 2022 (the "2/9/22 Article"). Available online at https://nyc.streetsblog.org/2022/02/09/death-threats-follow-brooklyn-mans-illegal-parking-complaints-to-311-and-the-nypd/ (last accessed February 7, 2023).

142.    Also according to the 2/9/22 Article, that day, Mr. Melone received a total of "five threatening calls" including one in which the caller said, "'I'm gonna fuck you and your wife,'" another in which the caller said, "'I saw you had the cops come. I'm gonna hurt you'", and another in which the caller said, "'I'm going to kill you, I'm going to kill you'", and a final call in which the caller said, "'Don't think I forgot about you. I'm going to fuck the shit out of you when I get a chance. You and your fucking wife. And if you keep them little sloppy sexy little kids around I'm going to get them too, you son of a bitch.'"

143.    Also according to the 2/9/22 Article:

Melone's 311 complaint on Jan. 31 was one of a dozen he's filed about the gray Lincoln pick-up truck over the past year — all for parking illegally in front of bus stops and hydrants or on pedestrian islands around Ninth Street and Eighth

22

Avenue. Police wrote tickets in response to two of those complaints, but took no action in response to most of the rest, city records show.

The truck seemed retrofitted to skirt accountability. Photos by Melone show a New York State Police Investigators Association sticker on the windshield, a sign reading FUNERAL on the dashboard, and four different temporary paper license plates — three from New Jersey and one from Minneapolis — borne by the truck over the course of a year.

144. Also according to the 2/9/22 Article, the reporter interviewed the owner of the truck, who said he had "been tipped off" before January 31, 2022 that Mr. Melone "had filed 311 complaints about hist ruck and posted it on Twitter" but that the owner "wouldn't say who informed him of this, saying only, 'I have people in higher places as well.'"

145. Also according to the 2/9/22 Article, "Dianne Struzzi, a spokeswoman for the Department of Investigation, called the incident 'concerning' and said the department's investigation into the 311 harassment allegations is active."

146. Additionally, many New Yorkers have taken to social media, including Twitter, to report and discuss illegally parked NYPD vehicles and/or false or fraudulent NYPD responses to 311 complaints lodged related to them.

147. For example, Twitter account @NYPD_Parking – "NYPD Parks On Our Sidewalks" – is dedicated to "submit[ting] 311 complaints for violations of" the prohibitions on illegal parking contained in Chapter 34 of the Rules of the City of New York § 4-08(e)(3) and New York City Administrative Code § 19-162.5 in what the account calls "NYPD Self Noneforcement Zones" in order "to document a #CultureofCorruption." *See* https://twitter.com/NYPD_Parking (last accessed February 7, 2023).

148. Between May of 2019 and February 7, 2023, the account has tweeted over 2,880 times, often documenting situations in which, despite photographic evidence submitted along

with the complaint, the City's response was: "The Police Department responded to the complaint and determined that police action was not necessary."

149.     Twitter users have also reported harassment and/or retaliation between 2021 and the present by individuals who appear to be NYPD members in response to 311 complaints about illegally parked vehicles, including NYPD vehicles.

150.     On April 30, 2022, Twitter user @pencurrier tweeted: "Just submitted a few @311 tickets about NYPD parking their personal cars illegally, must be a coincidence though," along with a picture of ten missed calls in around 15 minutes from a blocked number or numbers. *See* @pencurrier, *Twitter,* April 30, 2022. Available online at

https://twitter.com/Pencurrier/status/1520502765172232192 (last accessed on February 7, 2023).

151.     In a follow-up tweet on May 2, 2022, @pencurrier said she knew the callers were NYPD because she finally picked up the call, and also because she had previously been harassed by NYPD members who had called her in response to her 311 complaints, including "[o]ne time [an] officer yelled through the phone the entire time and told me he knows where I live." *See* @pencurrier, *Twitter,* February 7, 2023. Available online at

https://twitter.com/Pencurrier/status/1521073806000984064 (last accessed on February 7, 2023).

152.     In another follow-up tweet on May 2, 2022, @pencurrier said she intended to file a CCRB complaint that day. *See* @pencurrier, *Twitter*, May 2, 2022.  Available online at

https://twitter.com/Pencurrier/status/1521153045010210818 (last accessed on February 7, 2023).

153.     In a May 2, 2022 tweet in response to @pencurrier's tweets, Twitter user @Theo4710286 said: "My favorite are the late night calls to something I 311'd midday." *See* @Theo47102867, *Twitter*, May 2, 2022.  Available online at

https://twitter.com/Theo47102867/status/1520983089601814529 (last accessed February 7, 2023).

154.    On May 11, 2022, Twitter user @D00RZ0NE tweeted, "Made some @nyc311 @placardabuse complaints today" along with a screenshot of six calls received in response within a span of six minutes from an unknown number *See* @D00RZ0NE, *Twitter*, May 11, 2022. Available online at https://twitter.com/D00RZ0NE/status/1525220256540680195 (last accessed February 7, 2023).

155.    In a follow-up tweet on May 13, 2022, @D00RZ0NE tweeted: "Harassing voicemails have been shared with DOI and CCRB." *See* @D00RZ0NE, *Twitter*, May 13, 2022. Available online at https://twitter.com/D00RZ0NE/status/1525219203820793857 (last accessed February 7, 2023).

156.    At around 12:13 am and 12:22 am on July 23, 2022, Paul Schreiber submitted two 311 complaints – assigned Service Request ("SR") #s 311-11119860 and 311-11119945 - regarding two vehicles that he believed had illegal license plates and that appeared to be illegally parked within the confines of the NYPD's 84th Precinct, along with pictures of the vehicles.

157.    At 1:16 am and 1:30 am, Mr. Schreiber received e-mails from the 311 system informing him that the complaints had been closed.

158.    Then, just before 2:00am on July 23, 2022, Mr. Schreiber received a phone call, and a voicemail, from a person who identified themselves as a Lieutenant from the NYPD's 84th Precinct.

159.    The caller stated that Mr. Schreiber had made two 311 complaints but that both vehicles had "legit plates" and were parked legally, so the caller was "not sure why" Mr.

Schreiber had made the complaints" and asked that Mr. Schreiber call the 84th Precinct to "clarify."

160.    Mr. Schreiber has said that, whether or not he was right that about the vehicles' plates or parking, a NYPD member's calling him about his 311 complaints in the middle of the night was unreasonable.

161.    On February 6, 2023, Twitter user @jehiah tweeted: "I've had NYPD call me about a report of a vehicle with an illegal license plate cover and then hang up when I asked for their name or badge number." *See* @jehiah, *Twitter*, February 6, 2023. Available online at https://twitter.com/jehiah/status/1622806477311205377?s=20&t=aQDR5dA7pG_O0oEd426yXw (last accessed February 7, 2023).

162.    Upon information and belief, the foregoing are just some examples of incidents involving NYPD harassment and/or retaliation of individuals other than Mr. Sherwood in response to 311 complaints about illegally parked vehicles, including illegally parked vehicles owned or operated by NYPD members.

163.    Yet, despite all that, the City has allowed a culture to flourish where NYPD members feel completely comfortable — and even justified — in calling to harass members of the public who report illegally parked NYPD vehicles to 311.

**FIRST CLAIM FOR RELIEF**

**First Amendment Retaliation**

**Against the Individual Defendants**

**Pursuant to 42 U.S.C. Section 1983 for violating Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution**

164.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

165.    The Individual Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

166.    The Individual Defendants engaged in the acts and omissions complained of herein because of Plaintiff's protected speech and/or conduct.

167.    The Individual Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

168.    The Individual Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

169.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights, caused Plaintiff emotional injury, and/or otherwise damaged and injured Plaintiff.

170.    The Individual Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Municipal Liability

### Against Defendant City of New York

*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First Amendment to the United States Constitution*

171.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

172.    All of the wrongful acts or omissions complained of herein were carried out by the Individual Defendants and other City agents, including NYPD members, pursuant to customs, practices, and usages of the City that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City.

173.    For example, Defendant City had, and has, *de facto* policies, practices, and customs of allowing NYPD members to ignore or otherwise fail to respond appropriately to 311 complaints about illegally parked vehicles, including illegally parked vehicles owned or operated by NYPD members, and of allowing NYPD members to harass and/or retaliate against people who lodge them, such as Mr. Sherwood, without properly investigating, supervising, and/or disciplining NYPD members who engage in such misconduct.

174.    At all times relevant to Plaintiff's claims herein, Defendant City knew or should have known that NYPD members parked vehicles they owned or operated illegally near the NYPD's 84th Precinct, TD30, and other NYPD commands and locations.

175.    At all times relevant to Plaintiff's claims herein, Defendant City knew or should have known that NYPD members had a practice and custom of closing 311 complaints about

such illegally parked vehicles without first having properly investigated and/or taken appropriate law enforcement action in response to the conditions reported in the complaints.

176.    At all times relevant to Plaintiff's claims herein, Defendant City knew or should have known that NYPD members had a practice and custom of harassing and/or retaliating against people who lodge 311 complaints about illegally parked vehicles, including, but not limited to, with respect to such complaints lodged within the jurisdiction of the NYPD's 84th Precinct.

177.    The acts and omissions complained of herein are a direct and proximate result of those *de facto* policies, practices, and customs, and of the failures of Defendant City and the NYPD properly to train, supervise, investigate, and discipline the Individual Defendants and other NYPD members.

178.    At all times relevant to Plaintiff's claims herein, Defendant City was and is responsible for ensuring that reasonable and appropriate training, supervision, and discipline were and are in place within the NYPD.

179.    Defendant City of New York has long had actual or constructive knowledge of the NYPD's inadequate training, supervision, and discipline with respect to its members' abuse of their authority related to responding to 311 complaints about illegally parked vehicles, including vehicles owned by NYPD members, and with regard to the need to refrain from retaliating against the people who lodge such complaints.

180.    Defendant City has displayed deliberate indifference to Plaintiff's rights secured by the First Amendment to the United States Constitution, as well as related provisions of the New York State Constitution and New York laws, for example through the City's failures, and

the failures of the City's policymaking agents, to train, supervise, and discipline the Individual

Defendants and other NYPD officers, despite knowledge of their wrongful acts.

181.    Defendant City has otherwise demonstrated deliberate indifference to the needs to

properly train, supervise, investigate, and discipline NYPD members – including the Individual

Defendants - in the areas of illegally parked vehicles, 311 complaints related to them, responding

appropriately to them, and refraining from retaliating against people who bring them – among

others.

182.    For example, the facts pleaded elsewhere in this complaint call into question the

adequacy of the NYPD's training regarding parking regulations applicable to NYPD vehicles

and their enforcement, investigating and responding to 311 complaints, the need to refrain from

harassing and/or retaliating against people who make 311 complaints, including about illegally

parked vehicles owned or operated by NYPD members, City policies – at least on paper – about

the treatment of private identifying information collected related to 311 complaints, the need to

refrain from harassing and/or retaliating against people who make 311 complaints, the need to

investigate complaints of and information about such harassment and/or retaliation, among other

topics.

183.    Additionally, at all times relevant to Plaintiff's claims herein, Defendant City

knew or should have known that that Individual Defendants engaged in harassment of and/or

retaliation against Mr. Sherwood for lodging legitimate 311 complaints about illegally parked

vehicles, including about such illegally parked vehicles owned or operated by NYPD members,

near the NYPD's 84th Precinct and TD30.

184.    The lack of supervision and discipline of the Individual Defendants and of the

unidentified NYPD members involved in the harassment and/or retaliation described herein of

individuals other than Mr. Sherwood are examples of the City's failures to supervise and/or discipline NYPD members whom Defendant City knew, or should have known, have engaged in harassment and/or retaliation in response to 311 complaints about illegally parked vehicles owned or operated by NYPD members.

185.    Despite ample notice of such inadequate training, supervision, and discipline, Defendant City has taken either no steps – or, alternately, no *meaningful* steps - to ensure that reasonable and appropriate types and levels of training, supervision, investigation, and discipline were or are in place to ensure that NYPD members investigate and respond appropriately to 311 complaints about illegally parked vehicles, including vehicles belonging to NYPD members, and refrain from retaliating against the people who lodge them.

186.    Defendant City has not only tolerated, but actively fostered, a lawless atmosphere within the NYPD on those fronts, and because Defendant City has chosen not to take meaningful action to correct the chronic, systemic, and institutional misuse and abuse of police authority by its NYPD employees described herein, it has also effectively adopted, condoned, and ratified the Individual Defendants' – and other, similar NYPD - misconduct.

187.    As seen above, the City has exhibited deliberate indifference to the realities that its NYPD members' *de facto* policies, practices, and customs, and the inadequate of training, supervision, investigation, and discipline described herein, would lead to the violation of individuals' constitutional rights in general, and caused the violations of Mr. Sherwood's rights in particular.

188.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights, caused Plaintiff emotional injury, and/or otherwise damaged and injured Plaintiff.

## THIRD CLAIM FOR RELIEF

### Violations of New York State Law

### Against All Defendants

### *Pursuant to New York State Common Law and the New York State Constitution*

189.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

190.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

191.    Defendants' acts and omissions constituted the following violations of New York State common law and/or the New York State Constitution:

a.  *Prima facie* tort;

b.  Intentional infliction of emotional distress;

c.  Negligent infliction of emotional distress;

d.  Negligent hiring, screening, retention, supervision, and/or training;

e.  New York Civil Rights Law § 79-P (the New Yorker's Right to Monitor Act); and

f.  Violation(s) of Claimant's rights pursuant to the Constitution of the State of New York, including, but not limited to, Article I, Sections 8 (freedom of speech and press) and 9 (right to assemble and petition).

192.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of

Plaintiff's federal, state, and/or other legal rights, caused Plaintiff emotional injury, and/or otherwise damaged and injured Plaintiff.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. Actual and punitive damages against the Individual Defendants in an amount to be determined at trial;

2. Actual damages in an amount to be determined at trial against the City of New York;

3. Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, New York Civil Rights Law § 79-P, and New York common law;

4. A declaratory judgment declaring that the Individual Defendants' misconduct complained of herein violated Mr. Sherwood's rights under the First Amendment to the United States Constitution and/or the laws and/or the Constitution of the State of New York, including, but not limited to, New York Civil Rights Law § 79-P and Article I, Sections 8 (freedom of speech and press) and 9 (right to assemble and petition); and

5. Such other relief as the Court deems just and proper.

Dated: Brooklyn, New York
       February 7, 2023

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

J. Remy Green
Elena L. Cohen
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com